IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AMBER NIELSON, APRIL BOONE, and SHERI COPIER,<br><br>      Plaintiffs,<br><br>v.<br><br>JORDAN SCHOOL DISTRICT,<br><br>      Defendant. | **MEMORANDUM DECISION AND ORDER DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PARTIAL SUMMARY JUDGMENT FOR PLAINTIFFS**<br><br>Case No. 2:20-cv-00337-RJS-DAO<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

This case concerns whether Defendant Jordan School District's (JSD) termination of Plaintiffs Amber Nielson, April Boone, and Sheri Copier violated their implied contract with JSD and their due process rights.[1]  Now before the court are Plaintiffs' Motion for Partial Summary Judgment[2] on their breach of implied contract claim and JSD's Motion for Summary Judgment.[3]  For the following reasons, Plaintiffs' Motion for Partial Summary Judgment is DENIED as MOOT, and JSD's Motion for Summary Judgment is DENIED in part and DENIED as MOOT in part.  The court GRANTS partial summary judgment for Plaintiffs on their declaratory judgment and statutory due process claims.

## BACKGROUND

This matter arises from the June 2018 termination of Plaintiffs—three career educators— from JSD .[4]  All Plaintiffs claim their termination, under an alleged Reduction-in-Force (RIF),

---

[1] *See* Dkt. 26, *Amended Complaint*.

[2] Dkt. 23.

[3] Dkt. 32.

[4] *See* Dkt. 26 ¶¶ 4–7; Dkt. 27, *Answer to Amended Complaint* ¶¶ 4–7.

violated their implied contract with JSD and their constitutional due process rights.[5]

Additionally, Plaintiff Nielson claims her termination was an act of unlawful retaliation for

exercising her rights under the Family and Medical Leave Act (FMLA) and/or unlawful

discrimination based on her disabilities.[6]  JSD asserts it did not breach an implied contract with

Plaintiffs or violate their due process rights when it terminated them pursuant to a RIF.[7]

Additionally, JSD asserts Nielson's termination was pursuant to a valid RIF and not an act of

retaliation for taking FMLA leave or discrimination based on her disabilities.[8]

## I.   Factual Record for Summary Judgment

At summary judgment, the court reviews the parties' agreed-upon factual record and

draws all reasonable inferences therefrom in favor of the nonmovant.[9]  The following facts are

not genuinely in dispute, unless otherwise indicated,[10] and are drawn from the parties' summary

judgment briefing and attached affidavits and exhibits.[11]  They are admitted to the record for

summary judgment purposes.

---

[5] *See* Dkt. 26 ¶¶ 107–35.

[6] *Id.* ¶¶ 136–55.

[7] Dkt. 32 at 4.

[8] *Id.*

[9] *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012).

[10] The parties present numerous factual disputes in their respective briefs.  *See* Dkt. 23 at 2–9; Dkt. 30, *Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment* at 2–10; Dkt. 31, *Plaintiffs' Reply in Support of their Motion for Partial Summary Judgment* at 1–4; Dkt. 32 at 7–15; Dkt. 39, *Plaintiffs' Opposition to Defendant's Motion for Summary Judgment* at 8–34; Dkt. 44, *Defendant's Reply in Support of its Motion for Summary Judgment* at 4–16.  To the extent disputed facts are relevant to the parties' arguments at summary judgment, the court resolves those disputes herein as they arise.  Genuine disputes of material fact are stated as such.  The court refrains from making any judgment on factual disputes that are immaterial in resolving the parties' summary judgment motions.

[11] *See* Fed. R. Civ. P. 56(c); 28 U.S.C. § 1746; *see also Vazirabadi v. Denver Health and Hosp. Auth.*, 782 F. App'x 681, 687–88 (10th Cir. 2019).

Nielson, Boone, and Copier were all career educators[12] for JSD during the 2017–18 school year, and each were subjected first to a Reduction-in-Staff (RIS) and ultimately a Reduction-in-Force (RIF) in 2018.[13]  Schools within JSD conduct a RIS when their student enrollment for the next academic year is projected to be less than their current enrollment.[14] Teachers subject to a RIS are provided thirty days' notice that their employment may be subject to termination.[15]  'RISed' teachers may apply for other open positions in JSD; but, if not selected for a new position, their employment is terminated via a RIF.[16]

Enrollments for each of the three JSD elementary schools where Plaintiffs worked were projected to decrease between the 2017–18 and 2018–19 school years.[17]  While these individual schools projected decreased enrollment, JSD anticipated district-wide enrollment to grow between the 2017–18 and 2018–19 school years.[18]

### Amber Nielson

During the 2017–18 school year, Plaintiff Nielson was in her fourth year as a Foothills Elementary School teacher and in her eighteenth year working for JSD. [19]  In approximately 2002, Nielson was diagnosed with Crohn's disease and depression.[20]  In 2015, Nielson's principal at the time, Rebecca Lee, evaluated Nielson according to the district-mandated "Jordan

---

[12] Dkt. 39 at 8.

[13] Dkt. 23 at 4.

[14] Dkt. 32 at 8.

[15] *See* Dkt. 39-11, *Exhibit J to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, JSD Policy DP327 NEG – Reduction in Licensed Staff, 2016 Revision* at 2–3.

[16] *Id.*

[17] Dkt. 32 at 9, 12, 13.

[18] Dkt. 39 at 9.

[19] *Id.* at 14.

[20] *Id.*

Performance Appraisal System" (JPAS).[21]  The JPAS ratings scale from "Highly Effective,"

"Effective," "Minimally Effective," to "Not Effective."[22]  Lee rated Nielson as "Highly

Effective" because she demonstrated "exceptional skills" in engaging students in learning,

adjusting instruction to fit student needs, managing student behavior, maintaining relationships,

communicating with parents, collaborating with peers, and participating in out-of-class duties.[23]

Additionally, Nielson had a record of getting along with her colleagues.[24]

       Late in the summer of 2017, Nielson developed a "massive" kidney stone, which led to

eight major surgeries and prescription of narcotics.[25]  A stent was placed in her ureter to relieve

the kidney stone.[26]  Shortly after Nielson returned to teaching in mid-to-late August, she suffered

a severe allergic reaction to the stent and collapsed at work.[27]  The allergic reaction and narcotic

use caused Nielson to suffer an acute stress disorder, and she was taken to a psychiatric hospital

on approximately August 21, 2017, where she "detoxed."[28]  As a result, Nielson took FMLA

leave from August 21 through August 25, missing the first full week of the school year.[29]

       Nielson's depression symptoms were heightened as she started the 2017–18 school

year.[30]  Nielson experienced significant mood swings and Principal Wilson recognized a change

---

[21] *Id.* at 11, 19; Dkt. 44 at 13.

[22] Dkt. 39 at 11 n.7.

[23] *Id.* at 19.

[24] *Id.* at 23–24; Dkt. 44 at 14.

[25] Dkt. 39 at 14.

[26] *Id.*

[27] *Id.* at 14–15.

[28] *Id.* at 15.

[29] *Id.*

[30] *Id.*; *see also* Dkt. 44 at 10.  The parties dispute whether Nielson's depression resulted from her health problems. However, they do not dispute that Nielson became extremely depressed as she started the 2017–18 school year.

in her personality during the fall term.[31]  On rare occasions, Nielson's health issues resulted in her needing to leave school or miss days without the opportunity for advance notice.[32]

In November 2017, Nielson was diagnosed with thyroid cancer.[33]  Her doctor recommended immediate surgery, which Nielson scheduled to occur during winter break to minimize her absence from the classroom.[34]  She applied for FMLA leave from January 2 through February 2, 2018 to have time to recover.[35]  Wilson approved Nielson's FLMA leave, and Nielson arranged her own substitute teachers.[36]  The parties genuinely dispute whether Nielson provided effective substitute teacher plans before taking FMLA leave.[37]  Before taking her FMLA leave, in about December 2017, Nielson voluntarily stepped down from two leadership positions—the assistant team lead for the first-grade teachers and head of the Sunshine Committee—because she "didn't know what the cancer was going to require."[38]

During the 2017–18 school year, Foothills had forty teachers in first through sixth grade.[39]  Foothills' projected full-time staffing needs for 2018–19 was 36.5 teachers.[40]  Based on

---

[31] Dkt. 39 at 15–16; *see also* Dkt. 44 at 10–11.  The parties dispute whether Nielson's depression caused her mood swings.  However, they do not dispute that Nielson experienced mood swings and that Wilson noticed a change in Nielson's personality in the fall of 2017.

[32] Dkt. 39 at 15.

[33] *Id.*; *see also* Dkt. 44 at 10–11.  The parties dispute whether Nielson's cancer diagnosis exacerbated her depression and mood swings.  However, they do not dispute that Nielson was diagnosed with cancer in November 2017.

[34] Dkt. 39 at 16; Dkt. 44 at 11.

[35] Dkt. 39 at 16; Dkt. 44 at 11.

[36] Dkt. 39 at 16; Dkt. 44 at 11.

[37] Nielson asserts she prepared daily lesson plans for the substitute teacher prior to taking her FMLA leave in January 2018.  JSD asserts that she did not.  *Compare* Dkt. 39 at 16 *with* Dkt. 44 at 11.  Both parties cite to conflicting testimony from Nielson's grievance hearing to support their assertions.  *See* Dkt. 35-3, *Exhibit 11 to Defendant's Motion for Summary Judgment, Nielson Grievance Hearing Transcript* at 194–95; Dkt. 32-13, *Exhibit 12 to Defendant's Motion for Summary Judgment, Wilson Deposition* at 112.

[38] Dkt. 39 at 15–16; Dkt. 44 at 11.

[39] Dkt. 32 at 9.

[40] *Id.*

that projection and factoring in anticipated retirements, Wilson decided to RIS one teacher.[41]  To

determine which teacher to RIS, Wilson and her assistant principal created a rubric to rate every

Foothills teacher.[42]  Wilson considered "staffing needs" to create the rubric, including: (1) "what

makes a school run effectively," (2) "the attributes you need in staff to make a school run great,"

and (3) "what staff bring to the table to make a school great; their professionalism, ability to

communicate, ability to follow District and school goals."[43]  Wilson's rubric contained the

following criteria: (1) "Communicates professionally, effectively, and in a timely fashion with

parents, teachers, staff, and students;" (2) "Works well with others – is a problem solver and a

team player;" (3) "Makes decisions based on what's best for kids;" (4) "Follows through with

school level assignments and expectations;" (5) "Brings a positive energy to the faculty and

staff;" and (6) "Consistently attends and contributes to collaboration meetings, i.e. meetings with

[] team members."[44]  On the back of the rubric, a section entitled "other items to consider" had

space for handwritten notes and an area to mark whether parent requests to "transfer out" of a

teacher's classroom were "not a problem," "a rare occasion," or a "consistent problem."[45]

Wilson and her assistant principal rated every Foothills teacher according to the rubric

between February 14 and February 27, 2018.[46]  They focused on one teacher at a time and rated

on the series of indicators from the rubric.[47]  Wilson scored Nielson very low on almost all

---

[41] *Id.*; Dkt. 39 at 22; *see also* Dkt. 35-3 at 41–43.

[42] Dkt. 32 at 9; *see also* Dkt. 39 at 22.

[43] Dkt. 39 at 16.

[44] *Id.* at 16–17.

[45] *Id.* at 17.

[46] *Id.*

[47] Dkt. 32 at 9; Dkt. 39 at 22.

criteria on the rubric.[48]  Wilson based the rubric score in part on a two-to-three-minute classroom observation, which she conducted with each teacher.[49]  She observed Nielson's classroom to be chaotic with no direct instruction.[50]  When rating Nielson, Wilson also considered the conflicts Nielson had with other teachers and unprofessional behavior she displayed toward other teachers, Wilson, and district personnel during the 2017–18 school year.[51]

On the back page of Nielson's rubric, Wilson noted parent requests to "transfer out" of Nielson's class were a "consistent problem," and she handwrote extensive notes in the "other items to consider" section.[52]  Some of Wilson's handwritten notes included: (1) "sub complaints – no plans," (2) "FMLA January," (3) "parent request to move out – always gone sick," (4) "quit social committee chair and assistant team lead suddenly," (5) "very emotional saying she's not going to be back," (6) "anonymous phone call – anger, unstable, not good for kids," (7) "said she was overwhelmed . . . , but doesn't want help," (8) "mood highs and lows," (9) "energy at first –

---

[48] Dkt. 39 at 17.

[49] *Id.*

[50] Dkt. 32 at 10.  Plaintiffs dispute this fact because "Nielson's most recent JPAS indicated that she demonstrated 'exceptional skills' in 'engaging students in learning,' [] 'presenting information clearly, providing a courteous climate, and adjusting instruction to fit student needs and interests[]' [and] . . . in 'managing student behavior,' which requires 'frequently scanning the class to increase awareness of students' behavior and responding to observed behavior.'"  Dkt. 39 at 24.  JSD responds that Plaintiffs' cited evidence does not dispute the substance of the fact because "Nielson's JPAS was completed in January 2015 by Rebecca Lee and does not reflect Wilson's observations of Nielson" in 2018.  Dkt. 44 at 15.  The court agrees with JSD and finds these statements are not contradictory.  The court accepts that Nielson's 2015 JPAS indicated she had 'exceptional skills' in 'engaging students in learning,' 'presenting information clearly, providing a courteous climate,' 'adjusting instruction to fit student needs and interests,' and 'managing student behavior,' but that Wilson observed her classroom to be chaotic with no direct instruction in February 2018.

[51] Dkt. 32 at 10.  Plaintiffs dispute this fact and cite to Nielson's JPAS, which "states that she demonstrated 'exceptional skills' in 'collaborating with peers,' and note that Wilson admitted that Nielson had a record of getting along with her teammates.  Dkt. 39 at 23–24.  JSD responds that "Nielson's JPAS was completed in 2015 by Rebecca Lee and does not reflect Wilson's observations of Nielson[.] … Moreover, Wilson's testimony makes clear that she believed Nielson got along well with colleagues in the past, but that she had been struggling with her relationships during the [2017–18] school year."  Dkt. 44 at 14.  The court finds these statements are not contradictory and accepts that Nielson had a record of getting along with her teammates, but had conflicts with other teachers and acted unprofessionally toward other teachers, Wilson, and district personnel in the 2017–18 school year.

[52] Dkt. 39 at 17.

gets overwhelmed/stops no follow through," (10) "took out full JPAS to interim . . . because of her mental instability – not doing well," (11) "lots of personal emergencies – leaves during the day and teachers take kids – (Fall 2017) – now they don't do it because of changing dynamics w/ her personality and the team changes."[53]  The parties genuinely dispute whether Wilson considered Nielson's mood changes, personal emergencies, and parent requests to move out of Nielson's class when rating Nielson on the RIS rubric.[54]  The parties also genuinely dispute whether Nielson properly entered her days absent in the Skyward timekeeping system.[55]

After they finished evaluating every Foothills teacher, Wilson and her assistant principal compiled the rubrics, added up the categories on each rubric to generate a total, and ranked the teachers from lowest to highest.[56]  Amber Nielson was the lowest-ranked teacher, prompting the administration to subject her to a RIS.[57]  On March 9, 2018, Nielson was notified of her RIS.[58] She inquired why the action was being taken but did not learn the basis for her RIS until April

---

[53] *Id.* at 17–18.

[54] Plaintiffs assert Wilson did consider these factors when rating Nielson, citing to Wilson's handwritten notes and testimony that she considered her handwritten notes when scoring teachers.  Dkt. 39 at 24–25.  JSD asserts that although Wilson testified that she generally considered her handwritten notes, she specifically testified that she did not consider Nielson's moods, personal emergencies, or the parent request to transfer out when scoring Nielson. Dkt. 44 at 15.

[55] JSD cites to Wilson's testimony in support of the proposition that "Nielson wouldn't put in her days absent in the Skyward system."  Dkt. 32 at 10; *see* Dkt. 32-13 at 38.  Plaintiffs dispute this fact because "JSD's 'Employee Leave Summary' record shows that Nielson reported approximately 8.25 sick days between August 2, 2017 – January 2, 2018.  [And] [t]his is consistent with Wilson's estimate that Nielson took about 'five to ten' sick days (apart from her FMLA leave) between August 2017 and January 2018."  Dkt. 39 at 23.  JSD responds that the Employee Leave Summary "shows the days absent but does not establish that Nielson entered these days into the Skyward system." Dkt. 44 at 14.  The court finds a genuine dispute exists concerning whether Nielson entered her days absent in the Skyward system.

[56] Dkt. 32 at 9.

[57] *Id.*

[58] Dkt. 39 at 19; Dkt. 44 at 13.

2019.[59]  Following her RIS, Nielson applied for at least forty jobs with JSD.[60]  She did not secure

a position and was terminated pursuant to a RIF, effective June 1, 2018.[61]

**Amber Boone**

Plaintiff Boone was a teacher at Riverside Elementary during the 2017–18 school year.[62]

Based on the 2018–19 student enrollment projections, Ronna Hoffman, Riverside's principal,

decided to RIS two teachers. [63]  In February 2018, Hoffman and her assistant principal created a

rubric to evaluate Riverside's teachers, with little assistance from the district.[64]  The rubric

included criteria such as "Contribution to School Climate," "Supports School Goals," and

"Reaching Every Child Every Day."[65]  Hoffman gave Boone very low scores on the rubric's

criteria because Boone was "negative" when working with other teachers on her team and "[n]ot

all children feel that she cares about them."[66]  Hoffman also indicated concern with Boone's

"classroom environment" because Boone had "very low rigor" in the classroom and did not

effectively use data to differentiate students.[67]  Based on the rubric, Hoffman determined Boone

should be one of the teachers subject to the RIS[68] and notified Boone on March 9, 2018.[69]

---

[59] Dkt. 39 at 19; Dkt. 44 at 13.

[60] Dkt. 39 at 19.

[61] *Id.*

[62] *Id.* at 10.

[63] Dkt. 32 at 13.

[64] Dkt. 39 at 10.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.* at 10–11.

[69] *Id.* at 12.

Boone was "stunned" by this decision.[70]  On her most recent JPAS, Hoffman had rated Boone as "Effective."[71]  And in November 2017, Hoffman had written a letter of recommendation indicating that Boone was "a very flexible, cheerful person" with a "positive attitude" and a "great addition" to the kindergarten team.[72]  Boone asked why she was being RISed and what aspects of her performance were unsatisfactory, but she never received a copy of the rubric and did not learn the basis for her RIS until April 2019.[73]

Following her RIS, Boone applied for at least forty-three positions with JSD.[74]  She did not secure another position and was terminated pursuant to a RIF, effective June 1, 2018.[75]

### Sheri Copier

Plaintiff Copier taught at Mountain Shadows Elementary during the 2017–18 school year.[76]  Based on the 2018–19 enrollment projection, Mountain Shadows needed to reduce its number of teachers by one.[77]  Annette Huff, Mountain Shadows' principal, created a rubric with minimal assistance from JSD.[78]  The rubric contained criteria like "works well with others," "brings a positive energy to the faculty and staff," and "willing to learn and try new things."[79]  Huff gave Copier very low scores on the rubric's criteria because Coper did not work well with

---

[70] *Id.* at 11.

[71] *Id.*

[72] *Id.*

[73] *See id.* at 11; Dkt. 44 at 7.

[74] Dkt. 39 at 12.

[75] *Id.*

[76] *Id.*; Dkt. 32 at 12.

[77] Dkt. 32 at 12.

[78] Dkt. 39 at 12.

[79] *Id.*

her team members, "got angry" when other people looked at her students' data, was disorganized, and "had a problem with classroom management."[80]

In May 2014, Copier received a "letter of concern" about her performance, prompting her to take the letter "seriously" and follow through with all recommendations for improvement.[81] After receiving the letter, Copier was given no further discipline and her performance improved substantially.[82]  And in December 2015, Huff gave Copier an "Effective" JPAS rating.[83] However, Principal Huff chose not to consider the JPAS rating when scoring teachers on the 2018 RIS rubric.[84]

Copier was notified of her RIS on March 8, 2018.[85]  After receiving notice, Copier asked why she was being RISed and what aspects of her performance were unsatisfactory, but she did not learn the basis for her RIS until April 2019.[86]  Following her RIS, Copier applied for at least sixty-six positions with JSD; however, she did not secure a position and was terminated pursuant to a RIF, effective June 1, 2018.[87]

### JSD's RIF Policy

In 2018—the year that all Plaintiffs were terminated under a RIF—JSD's RIF policy stated: "If a licensed employee is terminated through a RIF, the employee will be given first consideration for available positions for which they apply online and are qualified within one (1)

---

[80] *Id.* at 13.

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.* at 14.

[86] *See id.* at 14; Dkt. 44 at 10.

[87] Dkt. 39 at 14.

year of the date of the RIF.  However, there is no guarantee of continued employment."[88]  The

policy language was ratified in 2011,[89] and thereafter was revised to add the word "online" in

2016.[90]  No additional language in the 2011 RIF Policy or the 2016 revision interpreted or

defined "first consideration."[91]  In January 2019, six months after Plaintiffs were terminated

through the RIF, the JSD School Board ratified an updated RIF Policy, negotiated between JSD

and Jordan Education Association (JEA), that read: "If a licensed employee is terminated

through a RIF, the employee will be contacted and given the opportunity to interview for

available positions for which they apply online and are qualified within one (1) year of the date

of the RIF."[92]

Following their respective terminations, Plaintiffs each applied for positions within JSD,

but were not hired for any.[93]  JSD's Human Resources Director testified that Plaintiffs received

the "same opportunity that anyone would have to apply" and the treatment they received did not

vary as compared to "anybody off the street" applying for the same jobs.[94]

---

[88] Dkt. 39-11 at 3; Dkt. 30 at 3–4.

[89] Dkt. 23 at 4.

[90] *Id.*; Dkt. 30 at 4.

[91] Plaintiffs purportedly dispute the assertion that "[t]here is no additional language interpreting or defining 'first consideration' in JSD's policies."  Dkt. 30 at 10; Dkt. 31 at 4.  However, Plaintiffs do not appear to contest that there is no additional language interpreting of defining 'first consideration' in the 2011 RIF Policy or its 2016 revision, which was in effect when Plaintiffs were terminated.  Rather, Plaintiffs response adds facts regarding the 2019 RIF policy.  Dkt. 31 at 4.  JSD does not contest the content of the updated RIF policy, as ratified by the School Board in January 2019.  *See* Dkt. 44 at 13–14.  Rather, JSD asserts that "subsequent negotiations by the negotiating teams have no bearing on what was negotiated and agreed upon for the policies in place at the time of the RIF."  *Id.*  To the extent JSD's objection sets forth its legal argument regarding the applicability of subsequent revisions to interpreting the parties' prior agreement, it is overruled.

[92] *See* Dkt. 31-1, *Exhibits to Plaintiffs' Reply in Support of their Motion for Partial Summary Judgment* at 16 (Exhibit X, January 8, 2019, JSD Board of Education Meeting Minutes).

[93] Dkt. 23 at 7–8.

[94] Dkt. 31 at 1–2; *see also* Dkt. 30 at 9; Dkt. 23-1, *Exhibits to Plaintiffs' Motion for Partial Summary Judgment* at 116–17 (Exhibit L, Nielson Grievance Hearing Transcript).

**Plaintiffs' Grievance Process**

Following their respective RISs, Plaintiffs began the five-step grievance process outlined in JSD's negotiated grievance policy.[95]  Pursuant to Step I, a JEA Representative discussed Copier's grievances with Principal Huff on May 21, 2018[96] and Boone's grievances with Principal Hoffman on May 22, 2018.[97]  Both principals indicated that the respective teachers were RISed because of their low rubric scores and, unless hired for an available position, they would be terminated under a RIF, effective June 1, 2018.[98]

Pursuant to Step II of the JSD grievance policy, Nielson, Boone, and Copier each filed their respective grievances with their immediate supervisors.[99]  And on June 22, 2018, Plaintiffs each filed a grievance at Step III, which resulted in an investigation into each teacher's RIS by an investigatory committee and the District Grievance Officer, a JSD administrator.[100]  The District Grievance Officer determined JSD had not violated Utah statute or any JSD policies with respect to each Plaintiff's RIS.[101]

On July 19, 2019, Plaintiffs filed their respective grievances at Step IV of the JSD grievance policy, resulting in the joint selection of an impartial hearing examiner.[102]  The impartial examiner, who was not a JSD employee or board member, determined that each Plaintiff's termination under a RIF violated state law because the RIFs had been based on

---

[95] See Dkt. 23-1 at 52–57 (Exhibit I, DP315 NEG – Grievance Procedure – Licensed).

[96] Dkt. 32 at 12; Dkt. 39 at 28–29.

[97] Dkt. 32 at 14; Dkt. 39 at 31–32.

[98] Dkt. 32 at 12, 14; Dkt. 39 at 28–29, 31–32.

[99] Dkt. 32 at 11, 12, 14; Dkt. 39 at 26, 29, 32.

[100] Dkt. 32 at 11, 12, 14; Dkt. 39 at 26–27, 29–30, 32.

[101] Dkt. 39 at 26–27, 29–30, 32.

[102] Dkt. 32 at 11, 13, 14; Dkt. 39 at 27, 30, 32–33.

declining enrollment in a specific school, rather than the entire district, and violated JSD policy by having no meaningful process for giving RIFed teachers "first consideration."[103]

JSD's Board of Education held a hearing on August 13, 2019, during which Plaintiffs' counsel made a brief presentation to the Board regarding each Plaintiff's termination through a RIF.[104]  The Board found that JSD had not violated Utah statute or its policies with respect to Plaintiffs' terminations.[105]  Having exhausted their administrative remedies, Plaintiffs initiated this action.

## II.   Procedural History

On May 29, 2020, Plaintiffs filed their Complaint, asserting JSD had breached its implied contract with Plaintiffs and deprived them of their property interest without due process.[106] Plaintiff Nielson also brought an individual claim that JSD had unlawfully retaliated against her for exercising her rights under the FMLA.[107]  JSD filed its Answer on October 19, 2020,[108] and filed an Amended Answer on January 29, 2021.[109]  On August 18, 2021, Plaintiffs filed their Motion for Partial Summary Judgment on their implied breach of contract claim based on their allegations that JSD failed to give them "First Consideration" for other positions following their respective RIFs.[110]  On August 20, 2021, Plaintiffs filed their Amended Complaint, adding

---

[103] Dkt. 32 at 11, 13, 14; Dkt. 39 at 27, 30, 32–33.

[104] Dkt. 32 at 11, 13, 14; Dkt. 39 at 28, 31, 33–34.

[105] Dkt. 39 at 28, 31, 33–34; Dkt. 44 at 15–16.

[106] Dkt. 2.

[107] *See id.* ¶¶ 136–43.

[108] Dkt. 9.

[109] Dkt. 13.  JSD sought, and the court granted, leave to amend its Answer.  *See* Dkt. 11, *Motion to Amend Defendant's Answer*; Dkt. 12, *Order Granting Motion to Amend Answer*.

[110] Dkt. 23.

Nielson's individual claim of unlawful discrimination under the Rehabilitation Act.[111]  On

August 20, 2021, JSD filed its Answer to the Amended Complaint.[112]  And on November 15,

2021, JSD filed its own Motion for Summary Judgment on all claims.[113]  Both summary

judgment motions having been fully briefed, oral argument was heard on June 28, 2022, and the

matters were taken under advisement.[114]

For the reasons described herein, the court concludes Plaintiffs' Motion for Partial

Summary Judgment is DENIED as MOOT.  Jordan School District's Motion for Summary

Judgment is DENIED in part and DENIED as MOOT in part.  The court GRANTS Plaintiffs

summary judgement on their declaratory judgment claim and their statutory due process claims.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact" and the moving party is "entitled to judgment as a matter of law."[115]  A fact is material if it

"might affect the outcome of the suit under the governing law," and a dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."[116]

"Judgment as a matter of law is appropriate when the nonmoving party has failed to make a

---

[111] Dkt. 26 ¶¶ 144–55.  Plaintiffs sought, and the court granted, leave to amend their Complaint.  *See* Dkt. 24, *Stipulated Motion to Amend Complaint*; Dkt. 25, *Docket Text Order Granting Stipulated Motion to Amend Complaint*.  Because Plaintiffs' Amended Complaint added only Nielson's individual claim under the Rehabilitation Act, and made no changes to the previously pleaded claims, the court will discuss Plaintiffs' previously filed Motion for Partial Summary Judgment in relation to the Amended Complaint.  *Compare* Dkt. 2 *with* Dkt. 26.

[112] Dkt. 27.

[113] Dkt. 32.  In their Opposition to JSD's Motion for Summary Judgment, Plaintiffs "request that the Court [grant] summary judgment in Plaintiffs' favor on their declaratory judgment, breach of contract, and deprivation of due process claims."  Dkt. 39 at 59.  However, Plaintiffs' brief was not filed as a cross-motion for summary judgment and "[a] party may not make a motion, . . . or a cross-motion in a response or reply.  Any motion must be separately filed."  DUCivR 7-1 (a)(3).  Therefore, the court will consider Plaintiffs' Opposition as an opposition, not as a cross-motion for summary judgment.

[114] Dkt. 47, *Minute Entry for Proceedings on June 28, 2022*.

[115] Fed. R. Civ. P. 56(a).

[116] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."[117]

"Cross-motions for summary judgment are to be treated separately; denying one does not require granting another."[118]  "[T]he moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment."[119]  Though a defendant "does not have the ultimate burden of persuasion at trial," when moving for summary judgment, a defendant has "both the initial burden of production . . . and the burden of establishing that summary judgment is appropriate as a matter of law."[120]  This burden may be met by demonstrating "that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."[121]

Additionally, the court may grant summary judgment for the nonmoving party if "the facts were fully developed at [] summary judgment" such that "the nonmoving party [is] clearly [] entitled to a judgment as a matter of law[.]"[122]  But the court "should not grant summary judgment in favor of the nonmoving party where the movant has not had the opportunity to present the applicable facts" or when doing so would result in "procedural prejudice to the moving party."[123]

When determining whether the evidence is sufficient to support judgment as a matter of law, "the judge's function is not himself to weigh the evidence and determine the truth of the

---

[117] *Doe*, 667 F.3d at 1122 (internal quotation marks and citation omitted).

[118] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[119] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotation marks and citations omitted).

[120] *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (citation omitted).

[121] *Id.* at 979.

[122] *Doña Ana Mut. Domestic Water Consumers Ass'n v. City of Las Cruces, NM*, 516 F.3d 900, 912 (10th Cir. 2008).

[123] *Id.*

matter but to determine whether there is a genuine issue for trial."[124]  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[125]  This threshold inquiry ascertains whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[126]

In ruling on a motion for summary judgment, the court is to "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[127]  Nonetheless, "the judge must view the evidence presented through the prism of the substantive evidentiary burden."[128]

## ANALYSIS

### I.  Validity of the RIF

Plaintiffs were each subject to a RIS from their respective schools.  Thereafter, unable to secure another position within JSD, each was subject to termination from JSD under a RIF.  The parties do not dispute that the initiation of Plaintiffs' RIS and subsequent RIF was consistent with JSD policy.[129]  Nor do they dispute that JSD may choose to implement a RIS based on a school's declining enrollment without contravening Utah law.  Rather, the parties' dispute centers on whether JSD policy violates Utah law by permitting JSD to terminate an educator's

---

[124] *Liberty Lobby*, 477 U.S. at 249.

[125] *Id.* at 255.

[126] *Id.* at 249.

[127] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[128] *Liberty Lobby*, 477 U.S. at 254.

[129] *See* Dkt. 32 at 15–16; *see also* Dkt. 39 at 6–7.

employment via a RIF when there is decreased enrollment at a school, but not in the district as a whole.[130]

Under Utah's School District and Utah Schools for the Deaf and Blind Employee Requirements (previously the Public Education Human Resources Act and hereinafter "PEHRMA"), educators who have attained "career status" are afforded certain employment protections.[131]  Generally, career educators may only be terminated "for cause" and are entitled to statutory due process, in addition to their constitutional due process rights, and the opportunity for remediation prior to being terminated "for cause" or based on their "unsatisfactory performance."[132]  However, these statutory safeguards do not apply when an educator, regardless of "career status," is terminated pursuant to a RIF.[133]

The parties' dispute centers on whether PEHRMA's provision authorizing a RIF because of "declining student enrollments in the district" permits a district to implement a RIF when there is a decline in student enrollments at a given school within the district, or only when there is a decline in total student enrollments district-wide.  It is undisputed that student enrollments in JSD, as a whole, increased between the 2017–18 and 2018–19 school years.[134]  JSD has not

---

[130] *See* Dkt. 39 at 37 n.10 ("[A]lthough JSD correctly states that it may RIS a teacher based on a school's declining enrollment, its contention that it may terminate/RIF a teacher based on the school's declining enrollment is incorrect.").

[131] *See* Utah Code Ann. §§ 53G-11-501 – 53G-11-519 (2018) (PEHRMA).

[132] *See id.* § 53G-11-513 (2018) (dismissal procedures); *id.* § 53G-11-514 (2018) (nonrenewal or termination of a career employee's contract for unsatisfactory performance).

[133] *See id.* § 53G-11-516 (2018) ("Nothing in this part prevents staff reduction if necessary to reduce the number of employees because of . . ."); *Durfey v. Bd. of Educ. of the Wayne Cnty. Sch. Dist.*, 604 P.2d 480, 484 (Utah 1979) (interpreting very similar language from a previous iteration of PEHRMA and concluding: "This language is a clear exception from the other provisions of the Act.  There is nothing in any other section of the Act which would reasonably imply that the procedural safeguards found elsewhere in the Act apply whenever the termination is for the budgetary concerns indicated.").

[134] *See* Dkt. 39 at 9; Dkt. 44 at 4.

alleged other circumstances justifying a RIF.[135]   Rather, JSD contends that PEHRMA should be interpreted to allow a RIF "when there are declining enrollments at individual schools" within the district.[136]   JSD asserts that "nothing in the Act [] mandates that there be a district-wide decrease in student enrollment before a school district can RIS [or] RIF teachers."[137]   Plaintiffs contend the plain language of the statute should be interpreted to require district-wide declining enrollment before a RIF can occur.[138]   Plaintiffs assert their interpretation is supported by the plain language, the context of the statute as a whole, and the broader statutory purpose of PEHRMA.[139]   For the reasons stated below, the court agrees with Plaintiffs.

Issues of statutory interpretation present questions of law.[140]   When interpreting Utah state law, the court looks to Utah courts' principles of statutory construction for guidance.[141]   Utah courts' "primary goal in interpreting statutes is to give effect to the legislative intent, as evidenced by the plain language, in light of the purpose the statute was meant to achieve."[142]   In doing so, the court "look[s] first to the statute's plain language, in relation to the statute as a

---

[135] *See generally* Dkt. 32; Dkt. 44.

[136] Dkt. 44 at 18; *see also* Dkt. 32 at 16–17.

[137] Dkt. 32 at 17.

[138] Dkt. 39 at 38.  Plaintiffs also assert their interpretation is supported by the Utah Supreme Court's application of a prior iteration of the statute in *Durfey v. Board of Education of the Wayne County School District*.  Dkt. 39 at 38–39 (citing 604 P.2d at 482–83).  JSD responds that its interpretation is not foreclosed by *Durfey* because *Durfey* "did not involve the interpretation of the Act[.]"  Dkt. 44 at 17.  The court agrees with JSD.  In *Durfey*, the Utah Supreme Court did not interpret the justifications for a RIF enumerated in the 1953 predecessor to PEHRMA, but rather found sufficient evidence in the record to conclude plaintiff had been dismissed based on a RIF rather than his "competence or [] activities as a President of the Wayne County Education Association[.]"  *Durfey*, 604 P.2d at 482.

[139] Dkt. 39 at 37–40.

[140] *United States v. Almaraz*, 306 F.3d 1031, 1035 (10th Cir. 2002); *see also Regal Ins. Co. v. Canal Ins. Co.*, 93 P.3d 99, 100 (Utah 2004).

[141] *See United States v. Welch*, 327 F.3d 1081, 1094 (10th Cir. 2003) ("[W]e interpret the statute consistent with Utah state law.").

[142] *State v. Burns*, 4 P.3d 795, 799–800 (Utah 2000).

whole, to determine its meaning."[143]  The court interprets the statute "to render all parts of the statute relevant and meaningful, and thus, [will] presume the legislature used each term advisedly and according to its ordinary meaning."[144]

"When the meaning of a statute can be discerned from its [plain] language, no other interpretive tools are needed."[145]  But, if the statutory language remains ambiguous after conducting a plain language analysis—meaning "its terms remain susceptible to two or more reasonable interpretations"—the court will then "resort to other modes of statutory construction[.]"[146]

Thus, the starting point is the plain language of PEHRMA's RIF provision.  It states:

(1)    Nothing in [PEHRMA] prevents staff reduction if necessary to reduce the number of employees because of the following:

(a)    declining student enrollments in the district;

(b)    the discontinuance or substantial reduction of a particular service or program;

(c)    the shortage of anticipated revenue after the budget has been adopted; or

(d)    school consolidation.

(2)    A school district may not utilize a last-hired, first-fired layoff policy when terminating school district employees.

(3)    A school district may consider the following factors when terminating a school district employee:

(a)    the results of an employee's performance evaluation; and

(b)    a school's personnel needs.[147]

---

[143] *Calhoun v. State Farm Mut. Auto. Ins. Co.*, 96 P.3d 916, 921 (Utah 2004).

[144] *State v. Maestas*, 63 P.3d 621, 632 (Utah 2002); *see also Bd. Of Educ. of Jordan Sch. Dist. v. Sandy City Corp.*, 94 P.3d 234, 237 (Utah 2004) ("[I]t is axiomatic that a statute should be given a reasonable and sensible construction and that the legislature did not intend an absurd or unreasonable result.").

[145] *Marion Energy, Inc. v. KFJ Ranch Partnership*, 267 P.3d 863, 866 (Utah 2001) (internal citation and quotation marks omitted).

[146] *Id.*

[147] UTAH CODE ANN. § 53G-11-516 (2018).

Plaintiffs assert the plain language of subsection (1)(a) should be interpreted as only permitting a RIF when there is declining student enrollments in the district as a whole.[148] Plaintiffs first argue that, if the Legislature had intended to allow a RIF when there is declining enrollment at a school within the district, the Legislature could have said that.[149] Further, Plaintiffs note the RIF provision clearly acknowledges that educators are district employees and the decision to terminate under a RIF occurs at the district level.[150] From this, Plaintiffs argue "it would be nonsensical that a career educator could be RIFed simply because there was declining enrollment in her school."[151]

Relying on similar principles of interpretation, JSD notes "the Act does not state that a RIF is permissible only if there are declining enrollments district wide."[152] JSD goes on to argue the Act's use of the plural, "enrollments," "recognizes that there are multiple 'enrollments' in the district because there are multiple schools and departments in the district, each having different needs."[153] JSD also asserts that the RIF provision "does not use any term defined in [PEHRMA], does not refer to any other parts of [PEHRMA], but rather specifically states that nothing in other parts of [PEHRMA] prevents staff reduction."[154] JSD concludes, therefore, that "nothing in the Policy or in the way JSD implements the Policy [] conflicts with [PEHRMA]."[155] The court disagrees.

---

[148] *See* Dkt. 39 at 38.

[149] *Id.* ("The Legislature did not state that a staff reduction is allowed if there is 'declining student enrollments at school(s) with the district,' which it could have done had the intent been to allow for the termination of an employee if that employee's school suffered declining enrollment.").

[150] *Id.* (citing UTAH CODE ANN. § 53G-11-516(2)–(3) (2018)).

[151] *Id.*

[152] Dkt. 44 at 16.

[153] *Id.* at 17.

[154] Dkt. 32 at 17.

[155] *Id.*

First, the disputed language in PEHRMA's RIF provision does use the defined term "district."  PEHRMA defines "school district" or "district" to mean "a public school district" or "the Utah Schools for the Deaf and the Blind."[156]  Incorporating this definition, subsection (1)(a) of PEHRMA's RIF provision permits a RIF if necessary, because of declining student enrollments in the public school district.[157]  Thus, the plain language of this provision accords with Plaintiffs' interpretation—it refers to "the district," defined to mean "the public school district," not to "schools" or "schools within the district," as JSD advocates.[158]  JSD makes much of the use of the plural "enrollments" in subsection (1)(a).[159]  However, as Plaintiffs contended at oral argument, the court interprets "enrollments" as modifying the word it proceeds— "student"—referring to the multiple students enrolled in a district rather than alluding to the multiple schools within a district.  JSD's interpretation would have the court read additional language into subsection (1)(a) to permit a RIF when student enrollments at schools within the district decline.[160]  Thus, the plain language of subsection (1)(a), and its use of the defined term "district," supports Plaintiffs' interpretation.

Looking beyond subsection (1)(a) itself, PEHRMA's RIF provision, considered as a whole, also supports Plaintiffs' interpretation.  As Plaintiffs note, the RIF provision repeatedly "recognizes that educators are employees of their *school districts*" by referring to RIF requirements "when terminating school district employees[.]"[161]  Further, the court observes the same subsections of the RIF provision recognize that a RIF occurs as a district-level decision,

---

[156] UTAH CODE ANN. § 53G-11-501(12) (2020).

[157] Id. § 53G-11-516(1)(a) (2018).

[158] See Dkt. 44 at 18.

[159] Dkt. 32 at 17; Dkt. 44 at 16–17.

[160] See Dkt. 32 at 38.

[161] Id. (emphasis in briefing) (citing UTAH CODE ANN. § 53G-11-516(2), (3) (2018)).

rather than a school-level decision, by giving explicit directives of what "a school district" may and may not consider when terminating its employees. [162]  One factor a school district may consider when terminating employees pursuant to a RIF is "a school's personnel needs."[163]  Inclusion of this factor evidences two things relevant to interpreting subsection (1)(a).  First, the Legislature understood how to draft provisions directed to the level of individual schools, as demonstrated by permitting consideration of a school's personnel needs, rather than the district-level, as done in subsection (1)(a).  Second, the Legislature likely appreciated the differing personnel needs of schools within a district and chose to accommodate those needs as something the district may consider when terminating educators under a RIF—not as something which in itself permits the initiation of a RIF.  Therefore, the court finds the plain language of PEHRMA's RIF provision, considered in its entirety, also supports Plaintiffs' interpretation of subsection (1)(a) as requiring there to be declining total student enrollments in the district as a whole in order to initiate a RIF.

Lastly, PEHRMA's context as a whole enforces Plaintiffs' interpretation.  Different provisions of PEHRMA regularly set out responsibilities and provide guidance for different levels of public education administration including the "state board,"[164] the "state superintendent,"[165] "local school board[s],"[166] "school district[s],"[167] the "school district

---

[162] UTAH CODE ANN. § 53G-11-516(2) (2018) ("A school district may not utilize a last-hired, first-fired layoff policy when terminating school district employees."); *id.* § 53G-11-516(3) ("A school district may consider the following factors when terminating a school district employee: . . .").

[163] *Id.* § 53G-11-516(3)(b) (2018).

[164] *See, e.g., id.* § 53G-11-510(1) (2020) ("[T]he state board shall make rules . . .").

[165] *See, e.g., id.* § 53G-11-511(3) (2020) ("The state superintendent shall include the data reported . . . in the State Superintendent's Annual Report . . .").

[166] *See, e.g., id.* § 53G-11-506(1) (2019) ("A local school board shall develop an educator evaluation program . . .").

[167] *See, e.g., id.* § 53G-11-511(1) (2020) ("A school district shall report to the state board . . .").

superintendent,"[168] and "principal[s]."[169]  The Legislature presumably understood the multiple levels of administration for Utah's public schools and drafted PEHRMA specifying duties and directives at distinct levels.  PEHRMA's RIF provision fits into this larger statutory scheme by setting forth rules for the school district to adhere to in conducting a RIF.[170]  The Legislature understood how to delineate what level of administration a given provision applies to, and in drafting the RIF provision it repeatedly specified that the district is the level where a RIF can be authorized "if necessary . . . because of . . . declining student enrollments in the district[.]"[171]  Thus, reading subsection (1)(a) in the context of PEHRMA as a whole lends further support to Plaintiffs' interpretation.

Based on the plain language of the RIF provision, read within the context of PEHRMA as a whole, the court concludes that subsection (1)(a) permits a school district to conduct a RIF when doing so is necessary because of "declining student enrollments"[172] in the "public school district."[173]  JSD's initiation of Plaintiffs' RIFs based on declining student enrollments at Plaintiffs' respective schools at a time when student enrollments in the school district increased, was in violation of PEHRMA's RIF provision.  Because JSD advances no other justification for Plaintiffs' terminations,[174] the court concludes Plaintiffs were not terminated pursuant to a valid RIF.

---

[168] See, e.g., id. § 53G-11-508(3) (2020) ("[T]he school district superintendent . . . shall appoint a person . . .").

[169] See, e.g., id. § 53G-11-509(1) (2019) ("[T]he principal . . . shall assign a person . . . as a mentor . . .").

[170] See id. § 53G-11-516 (2018).

[171] Id. § 53G-11-516(1)(a) (2018).

[172] Id.

[173] Id. § 53G-11-501(12)(a) (2020).

[174] See id. § 53G-11-516(1)(a)–(d) (2018) (enumerating circumstances under which a school district may conduct a RIF).  JSD does not argue Plaintiffs' RIFs were justified based on "the discontinuance or substantial reduction or a particular service or program," "the shortage of anticipated revenue after the budget [was] adopted," or "school consolidation.  Id.; see Dkt. 32 at 15–18; Dkt. 44 at 16–18.

JSD nevertheless argues its RIF policy should be permitted to coexist with PEHRMA because "[t]he Policy does not offend the public policy to which [PEHRMA] gives voice."[175] JSD notes that the RIF provision is an exception to the other PEHRMA provisions and, as such, is not necessarily encompassed by the same public policy considerations.[176]  While PEHRMA is generally informed by a policy goal of improving public education by providing educators with specific support and feedback,[177] JSD argues the RIF provision is "an exception to this underlying public policy."[178]  JSD asserts that "the [L]egislature did not put [the RIF provision] in place for an employee's protection, but rather to allow school district[s] to reduce staff without having to comply with the other sections of the Act."[179]

Plaintiffs, on the other hand, argue the RIF provision "must be construed in harmony" with PEHRMA's other provisions.[180]  Plaintiffs emphasize that PEHRMA provides career educators, like them, with a "reasonable expectation of continued employment" and guarantees them certain protections and procedures before being terminated for unsatisfactory performance.[181]  Plaintiffs argue JSD's RIF policy "flies in the face of the procedural safeguards provided under PEHRMA," and that the Policy cannot coexist with the Act because it "would eviscerate" the protections guaranteed to career educators before their termination for reasons other than a valid RIF.[182]  The court agrees with Plaintiffs.

---

[175] Dkt. 32 at 17–18.

[176] Dkt. 44 at 18.

[177] *See* UTAH CODE ANN. § 53G-11-501.5(1) (2019).

[178] Dkt. 44 at 18.

[179] *Id.*

[180] Dkt. 39 at 40.

[181] *See id.* (quoting UTAH CODE ANN. § 53G-11-501(2) (2020)).

[182] *Id.*

Utah courts "have generally recognized that 'an enforceable contract can coexist with a statute that may conflict with its terms so long as the contract does not offend the public policy to which the statute gives voice.'"[183]  But the Utah Supreme Court has "not addressed whether a government agency may contract with an employee in violation of statutory requirements put in place for that employee's protection."[184]  This court need not make such a determination today. JSD's RIF policy cannot coexist with PEHRMA because, as applied to Plaintiffs, the Policy contravenes not only the Act's express terms but also "the public policy to which [it] gives voice."[185]

The public policy animating PEHRMA is "that the effectiveness of public educators can be improved and enhanced by providing specific feedback and support for improvement through a systematic, fair, and competent annual evaluation and remediation of public educators whose performance is inadequate."[186]  The RIF provision is indeed an exception to PEHRMA's other provisions, allowing for the termination of career educators without adherence to the procedures and protections to which they are otherwise entitled prior to being terminated for cause.[187] However, the RIF provision is a narrowly-delineated exception, allowing a district to terminate educators without adhering to PEHRMA's usual procedures only under four specific circumstances.[188]  JSD's Policy, if permitted to stand in contravention of PEHRMA's terms, would expand the RIF provision as an exception to PEHRMA's otherwise applicable protections.

---

[183] *Howick v. Salt Lake City Corp.*, 424 P.3d 841, 844 (Utah 2018) (quoting *Lee v. Thorpe*, 147 P.3d 443, 447 (Utah 2006)).

[184] *Id.*

[185] *See Lee*, 147 P.3d at 447.

[186] UTAH CODE ANN. § 53G-11-501.5(1) (2019).

[187] *See Durfey*, 604 P.2d at 484.

[188] UTAH CODE ANN. § 53G-11-516(1)(a)–(d) (2018).

In summary, the court concludes that Plaintiffs' interpretation of PEHRMA's RIF provision is consistent with the provision's plain language, the statute as a whole, and its intended purpose.[189]  Thus, JSD's RIF policy, as interpreted by JSD and applied to Plaintiffs, contravenes PEHRMA.  Plaintiffs were not terminated pursuant to a valid RIF because the circumstances present did not justify a RIF under PEHRMA.[190]  JSD's Motion for Summary Judgment is therefore DENIED with respect to Plaintiffs' declaratory judgment claim. Furthermore, because the facts have been fully developed such that it is clear Plaintiffs are entitled to judgment as a matter of law on their declaratory judgment claim, the court GRANTS summary judgment for Plaintiffs on that claim.[191]

## II.  Due Process

Plaintiffs' second cause of action asserts JSD deprived Plaintiffs of their property interest in continued employment without due process of law.[192]  Plaintiffs assert JSD failed to provide them with the procedural due process to which they were entitled to under Utah law and the United States Constitution.[193]  The court will address separately Plaintiffs' claims under Utah law and under the U.S. Constitution.

### a.  Statutory Due Process and Remediation

Plaintiffs claim JSD failed to provide them with due process as required under Utah law by terminating them "under the guise of a []RIF" without adequate pre-termination process,

---

[189] *See Burns*,4 P.3d at 799–800; *Calhoun*, 96 P.3d at 921.

[190] *See* UTAH CODE ANN. § 53G-11-516(1) (2018).

[191] JSD has had ample opportunity to put forth the facts on this issue and to develop and present its arguments as to the same.  No triable issue of fact remains as to the validity of Plaintiffs' RIF.  Therefore, no procedural prejudice ensues from granting summary judgment to Plaintiffs on their declaratory judgement claim.  *See Doña Ana Mut. Domestic Water Consumers Ass'n*, 516 F.3d at 912.

[192] *See* Dkt. 26 ¶¶ 115–128.

[193] *See id.*

remediation prior to their termination,[194] and "a full and fair post-termination process."[195]  JSD asserts that "neither Utah law nor JSD's policies require that a teacher be provided with remediation when she is subject to a []RIF" and that, "throughout [their] entire grievance process, Plaintiffs had more than adequate opportunity to make arguments and present evidence regarding their [] RIF."[196]

PEHRMA is animated by the Utah Legislature's finding "that the effectiveness of public educators can be improved and enhanced by providing specific feedback and support for improvement through a systematic, fair, and competent annual evaluation and remediation of public educators whose performance is inadequate."[197]  To that end, PEHRMA sets forth various requirements for the regular performance evaluation of educators[198] and processes for the dismissal of career educators.[199]  However, PEHRMA's RIF provision allows for reductions in staff "if necessary . . . because of . . . declining student enrollments in the district[.]"[200]  Terminations pursuant to a RIF are exempt from the protections otherwise provided to career educators under PEHRMA.[201]

---

[194] *Id.* ¶ 122.

[195] *Id.* ¶ 123.

[196] Dkt. 32 at 26.

[197] UTAH CODE ANN. § 53G-11-501.5 (2019).

[198] *See id.* § 53G-11-504 (2020) (evaluation of employee performance); *id.* § 53G-11-506 (2019) (establishment of educator evaluation program); *id.* § 53G-11-507 (2019) (components of educator evaluation program); *id.* § 53G-11-508 (2020) (summative evaluation timelines); *id.* § 53G-11-510 (2020) (state board to describe a framework for the evaluation of educators).

[199] *See id.* § 53G-11-512 (2019) (local school board to establish dismissal procedures); *id.* § 53G-11-513 (2018) (dismissal procedures); *id.* § 53G-11-514 (2018) (nonrenewal or termination of a career employee's contract for unsatisfactory performance).

[200] *Id.* § 53G-11-516 (2018) (necessary staff reduction not precluded).

[201] *Durfey*, 604 P.2d at 484 (interpreting similar language in PEHRMA's predecessor statute, "[n]othing in this act shall be construed to preclude staff reduction when necessary to decrease the number of teachers because of . . .[,]" and concluding that the procedural safeguards elsewhere in PEHRMA's predecessor statute do not apply when an employee is terminated pursuant to a RIF); *see also, e.g.,* Dkt. 39 at 36 ("PEHRMA allows for a bona fide RIF of career educators, without remediation or due process[.]").

The parties do not dispute that PEHRMA mandates different procedures and protections for career educators terminated under a valid RIF than for those terminated 'for cause,' including unsatisfactory performance.[202]  JSD contends that Plaintiffs received adequate pre- and post-termination processes to satisfy PEHRMA's procedural requirements for termination under a RIF.[203]  But JSD does not dispute, and the record makes clear, that Plaintiffs did not receive the statutorily-mandated processes, including remediation, they were entitled to as career educators terminated for unsatisfactory performance.[204]

Because the court has concluded that Plaintiffs were not terminated pursuant to a valid RIF, it follows that Plaintiffs were entitled to the procedural protections PEHRMA grants to career educators terminated for cause.  It is undisputed that Plaintiffs did not receive those statutorily mandated processes.  Therefore, JSD's Motion for Summary Judgment is DENIED in part.  And, because the facts on this issue have been fully developed at summary judgment and

---

[202] *See* Dkt. 39 at 34–36; *see also* Dkt. 32 at 24–26; Dkt. 44 at 19–20 (JSD's entire due process argument is premised on Plaintiffs having been terminated under a valid RIF).

Under PEHRMA, career educators "terminated . . for reasons of unsatisfactory performance" are entitled to certain processes and protections including: "written documentation clearly identifying the deficiencies in performance;" "notice that [their] contract is subject to nonrenewal or termination if, upon reevaluation . . . , [their] performance is determined to be unsatisfactory;" and "a plan of assistance . . . to allow [them] an opportunity to improve performance."  UTAH CODE ANN. § 53G-11-513(2) (2018); *id.* § 53G-11-514 (2018).  Employees terminated for cause other than unsatisfactory performance are not entitled to a plan of assistance but are still entitled to PEHRMA's other procedural protections.  *See id.* § 53G-11-501(15)(b) (2020) (defining conduct constituting cause for termination other than unsatisfactory performance); *id.* § 53G-11-512(4) (2019) (outlining dismissal procedures for educators exhibiting both unsatisfactory performance and other conduct constituting cause for dismissal); *id.* §§ 53G-11-513(5)(a), (5)(d) (2018) (providing generally applicable dismissal procedures).  These procedural protections do not apply to terminations under a valid RIF.  *See Durfey*, 604 P.2d at 484.

[203] *See* Dkt. 32 at 24–26; Dkt. 44 at 19–20.

[204] *See generally* Dkt. 32; Dkt. 39; Dkt. 44.

Plaintiffs are clearly entitled to judgment as a matter of law,[205] the court GRANTS summary judgment for Plaintiffs on their statutory due process claims.

### b. Constitutional Due Process

Plaintiffs also claim JSD violated their due process rights under the U.S. Constitution by depriving them of property interests without "pre-termination process and a full and fair post-termination process[.]"[206]  JSD contends that Plaintiffs received constitutionally-sufficient pre- and post-termination processes which afforded them "more than adequate opportunity to make arguments and present evidence regarding their [] RIF."[207]

JSD's arguments are premised on Plaintiffs having been terminated under a valid RIF.[208]  In light of this court's conclusion that Plaintiffs were wrongfully terminated under a statutorily-invalid RIF, JSD's arguments miss the mark and do not address whether Plaintiffs received their constitutional due process.  JSD has not demonstrated it is "entitled to judgment as a matter of law."[209]  Because of this failure of proof, JSD's Motion for Summary Judgment is DENIED in part.  The court makes no ruling as to the merits of Plaintiffs' constitutional due process claims.[210]

---

[205] *See Doña Ana Mut. Domestic Water Consumers Ass'n*, 516 F.3d at 912.  JSD has had ample opportunity to present the applicable facts and the agreed upon record at summary judgment reveals Plaintiffs have not received the processes due to career educators under PEHRMA for termination of career employees for unsatisfactory performance.  UTAH CODE ANN. §§ 53G-11-513, 514.  Thus, granting summary judgment for Plaintiffs does not result in procedural prejudice to JSD.

[206] Dkt. 26 ¶ 120.a; *see also id.* ¶¶ 122.a, 123, 125.

[207] Dkt. 32 at 26.

[208] *See id.* at 24–26.

[209] Fed. R. Civ. P. 56(a).

[210] *See* Dkt. 26 ¶¶ 120.a, 122.a, 123, 125.

### III.    First Consideration

When Plaintiffs were terminated, JSD policy DP327 stated: "[i]f a licensed employee is terminated through a RIF, the employee will be given first consideration for available positions for which they apply online and are qualified within one (1) year of the date of the RIF. However, there is no guarantee of continued employment."[211]  Plaintiffs claim JSD breached this policy by "[f]ailing to give first consideration to Plaintiffs after they were RIFed on June 1, 2018[.]"[212]  However, at oral argument, Plaintiffs' counsel stipulated this claim would be rendered moot were they to prevail on their declaratory judgment claim.  In view of the court's decision that summary judgment must be awarded to Plaintiffs on their declaratory judgment claim, Plaintiffs' claim for breach of contract is rendered moot.  The court will not reach the merits of whether JSD breached its policies by failing to give Plaintiffs "first consideration."

Plaintiffs' Motion for Partial Summary Judgment[213] is DENIED as MOOT and JSD's Motion for Summary Judgment is DENIED as MOOT in part.[214]

### IV.    Nielson's Claims Under the FMLA and Rehabilitation Act

In addition to the claims brought by all Plaintiffs, Plaintiff Nielson alleges her RIS and eventual termination violated the Family Medical Leave Act (FMLA) and the Rehabilitation Act.[215]  JSD moves for summary judgment on both of Nielson's claims.[216]

---

[211] *See* Dkt. 39-11 at 3.

[212] Dkt. 26 ¶ 112.b.

[213] Dkt. 23.

[214] Dkt. 32 at 18–23.

[215] Dkt, 26 ¶¶ 136–55.

[216] *See* Dkt. 32 at 27–30.

"The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave, without fear of termination[,] for a serious health condition."[217]  "It is unlawful for an employer to retaliate against an employee for taking FMLA leave."[218]  Nielson claims JSD unlawfully retaliated against her for taking FMLA leave because her RIS and eventual termination were allegedly based, at least in part, on her use of protected leave.[219]

The Rehabilitation Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her [] disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance."[220]  Nielson claims JSD discriminated against her "when it subjected her to a RIS, and ultimately a RIF, based at least in part on her disabilities."[221]

Nielson's claims under both the FMLA and Rehabilitation Act are subject to the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*.[222]  Under the *McDonnell Douglas* analysis, Nielson must first make a prima facie case of retaliation or discrimination.[223]  If she does, JSD must then offer a legitimate, non-retaliatory, and non-discriminatory reason for her termination.[224]  Nielson "then bears the ultimate burden of demonstrating that [JSD's] proffered reason is pretextual."[225]

---

[217] *Smothers v. Solvay Chems. Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (internal citations and quotation marks omitted).

[218] *Id.* at 539–40 (citing 29 U.S.C. § 2615(a)(2)).

[219] Dkt. 26 ¶¶ 136–43.

[220] 29 U.S.C. § 794.

[221] Dkt. 26 ¶¶ 144–55.

[222] 411 U.S. 792 (1973); s*ee also Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006) (applying *McDonnell Douglas* framework to retaliation claim under the FMLA); *Cummings v. Norton*, 393 F.3d 1186, 1189 (10th Cir. 2005) (applying *McDonnell Douglas* framework to Rehabilitation Act discrimination claim).

[223] *Metzler*, 464 F.3d at 1170.

[224] *Id.*

[225] *Id.* (citations omitted); *see also McDonnell Douglas Corp.*, 411 U.S. at 804–05.

### a. Prima Facie Case of Retaliation Under the FMLA

To establish a prima facie case of retaliation under the FMLA, Nielson must show: (1) she engaged in a protected activity, (2) JSD took an action that a reasonable employee would find materially adverse, and (3) the protected activity caused the adverse action.[226] Nielson's "burden is 'not onerous,'"[227] and she need only present a "small amount of proof necessary to create an inference" of retaliation.[228] The parties do not dispute the first two elements of Nielson's prima facie case: (1) Nielson took FMLA leave from January 2 through February 2, 2018—a protected activity under the FMLA; and (2) on March 9, 2018 Nielson was subjected to a RIS—an action a reasonable employee would find materially adverse.[229]

To establish the final, disputed element of a prima facie case of retaliation, Nielson "must show a causal connection between her protected activity of taking FMLA leave" and JSD's decision to RIS her.[230] "The critical inquiry at this prima facie stage is whether [Nielson] has demonstrated that [JSD's] action occurred under circumstances which give rise to an inference of unlawful [retaliation]."[231] Here, Nielson asserts unlawful retaliation may be inferred from the circumstances surrounding her RIS, including the temporal proximity of her return from FMLA leave and her notification of the RIS, and Wilson's handwritten notes on her RIS rubric.[232]

---

[226] *Metzler*, 464 F.3d at 1171.

[227] *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

[228] *Id.* (quoting *EEOC v. Flasher Co. Inc.*, 986 F.2d 1312, 1318 (10th Cir. 1992)); *see also EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000) ("At the prima facie stage of the *McDonnell Douglas* analysis, a plaintiff is only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant.").

[229] *See* Dkt. 32 at 27–28 ("JSD does not dispute the first two elements of Nielson's prima facie retaliation case.").

[230] *Metzler*, 464 F.3d at 1171.

[231] *Id.* (internal citation and quotation marks omitted).

[232] Dkt. 39 at 54–55.

In demonstrating a causal connection as part of her prima facie case, a plaintiff may rely on proximity alone when the protected activity is "*very close*" to the adverse action.[233]  The Tenth Circuit has held a period of six weeks between the protected activity and the adverse employment action is "very close," such that causation may be inferred.[234]  Whether proximity is based on when Wilson scored Nielson's RIS rubric or when Wilson informed Nielson she was RISed, at most five weeks elapsed between Nielson's return from FLMA leave and her RIS from Foothills Elementary.[235]

JSD does not dispute the temporal proximity between Nielson's FMLA leave and the RIS.  Rather, JSD argues temporal proximity is insufficient to establish Nielson's prima facie case because JSD's HR Director, Nick Hansen, was ignorant of Nielson's FMLA leave.[236]  JSD cites *Maestas v. Segura*, where the defendant's ignorance of the protected activity barred temporal proximity from establishing cause.[237]  JSD argues because Hansen was ignorant of Nielson's FMLA leave, cause cannot be inferred from temporal proximity.[238]  The court disagrees.

---

[233] *Metzler*, 464 F.3d at 1171 (emphasis in original).

[234] *Ramirez v. Okla. Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (finding one-and-a-half months is close enough to infer causation at the prima facie stage), *overruled on other grounds by Ellis v. Univ. of Kans. Med. Ctr.*, 163 F.3d 1186, 1194–97 (10th Cir. 1998); *see also Metzler*, 464 F.3d at 1171 (finding the time span "very close" when Metzler was terminated within six weeks of her employer learning that she intended to take FMLA leave and within four weeks of her FMLA protected leave request); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (finding three months was not close enough to infer causation); *Salemi v. Colo. Pub. Emps.' Ret. Ass'n*, 747 F. App'x 675, 700 (10th Cir. 2018) (finding five months between return from FMLA leave and the adverse action not close enough for temporal proximity alone to establish causation).

[235] Nielson returned from FMLA leave on February 5, 2018.  Dkt. 39-16, *Exhibit O to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, Nielson Leave Summaries* at 2.  Wilson rated Foothills' teachers on the RIS rubric between February 14 and February 27, 2018.  Dkt. 39 at 17.  Nielson was subjected to a RIS, based on her rubric score, on March 9, 2018.  *Id.* at 19.

[236] Dkt. 44 at 20–21.

[237] *Id.* at 20 (citing *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005) (finding temporal proximity insufficient to establish cause when the defendant who recommended the adverse action of transferring plaintiffs was ignorant of plaintiffs' protected activity)).

[238] *Id.* at 20–21.

In *Maestas*, the ignorant defendant was the one who recommended the adverse action.[239] Here, Principal Wilson—not Hansen—recommended that Nielson be RISed.  Wilson created the RIS rubric, scored Foothills' teachers, and ultimately determined Nielson would be RISed based on her low rubric score.[240]  JSD has presented no evidence showing Hansen was involved in deciding which teacher should be RISed from Foothills Elementary.[241]  As such, Hansen's ignorance does not prevent temporal proximity from establishing the causal element of Nielson's prima facie FMLA claim.  Wilson, the individual recommending adverse action against Nielson, was indisputably aware of Nielson's FMLA leave.[242]

Because less than six weeks elapsed between Nielson's protected activity and JSD's adverse action, the "very close" proximity test is met, and causation may be inferred to establish Nielson's prima facie case of retaliation under the FMLA.  Because causation is established on that fact alone, the court need not consider Nielson's other evidence regarding causation.[243]

### b.   Prima Facie Case of Discrimination Under the Rehabilitation Act

To establish a prima facie case for discrimination under the Rehabilitation Act, Nielson must show: "(1) [s]he was a disabled person under the statute, (2) [s]he was otherwise qualified for the job regardless of [her] disability, and (3) [s]he was terminated from [her] employment because of [her] disability."[244]  As with Nielson's retaliation claim, the parties dispute only the

---

[239] *Maestas*, 416 F.3d at 1189–90 (finding nothing in the record to indicate defendant was aware of plaintiffs' whistle blowing activities when he recommended their transfer).

[240] *See* Dkt. 44 at 21.

[241] *See generally* Dkt. 32 at 9–12, 27–30; Dkt. 44 at 20–23.

[242] *See* Dkt. 39 at 16–18; Dkt. 44 at 11–12.  It is undisputed that Wilson approved Nielson's FMLA leave and noted "FMLA January" in her comments on Nielson's RIS rubric.

[243] However, this evidence also pertains to Nielson's prima facie case of discrimination under the Rehabilitation Act and her argument that JSD's proffered reasons for her termination are pretextual.  As such, it is discussed in sections IV.b and IV.d, *infra*.

[244] *Cummings*, 393 F.3d at 1189.

final element, causation.[245]  It is undisputed Nielson had been diagnosed with Crohn's disease,

major depressive disorder, and cancer—all of which qualify as disabilities under the

Rehabilitation Act—and that she was otherwise qualified for her job.[246]

To meet the causation prong of her prima facie discrimination claim, Nielson must

present evidence that she was RISed because of her disabilities.[247]  The Rehabilitation Act

protects disabilities and "disability-caused conduct."[248]  When a disability involves a mental

health issue, the Act's protections extend to the "abnormal behavior" manifesting such a

disability.[249]  As with her FMLA claim, Nielson need only offer a "small amount of proof" to

create an "inference of discrimination."[250]

Nielson asserts discrimination can be inferred based on the handwritten notes Wilson

took while scoring Nielson's RIS rubric.[251]  It is undisputed that Wilson noted the following on

Nielson's RIS rubric: "quit social committee chair and assistant team lead suddenly," "always

gone sick," "lots of personal emergencies," "very emotional," "overwhelmed," "mood highs and

lows," "not doing well," "changing dynamics with her personality," and "mental instability."[252]

---

[245] Dkt. 32 at 28 ("JSD only contends that Nielson cannot establish the third element of her prima facie discrimination case.").

[246] *Id.*; *see also* 42 U.S.C. § 12102(2)(B); 29 C.F.R. § 1630.2(j)(1).

[247] *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011).  *EEOC v. C.R. England* was decided under the ADA.  However, the court notes that "[c]ases decided under section 504 of the Rehabilitation Act are [] applicable to cases brought under the ADA and vice versa, except to the extent the ADA expressly states otherwise." *Woodman v. Runyon*, 132 F.3d 1330, 1339 n. 8 (10th Cir. 1997) ("The ADA . . . extended to private employees many of the protections afforded the employees of federal grantees under section 504 of the Rehabilitation Act of 1973. . . .  [and] the Rehabilitation Act was amended . . . to incorporate into sections 501 and 504 the ADA's express provision[.]").  As such, the parties largely use case law applying the *McDonnell Douglas* framework in ADA cases in the context of Nielson's Rehabilitation Act claim.  The court will do the same.

[248] *McKenzie v. Dovala*, 242 F.3d 967, 974 (10th Cir. 2001).

[249] *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1087 (10th Cir. 1997).

[250] *Orr*, 417 F.3d at 1149 (internal citation and quotation marks omitted) (quoting *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1193).

[251] Dkt. 39 at 54–57.

[252] *See id.* at 17–18; Dkt. 44 at 11–12.

Because Wilson testified that she generally considered her notes when scoring teachers' RIS rubrics, Nielson argues it is reasonable to infer Wilson considered these notes, referencing Nielson's disability, when scoring Nielson.[253]  Thus, Nielson argues there is sufficient evidence to meet the causation element of her prima facie discrimination claim.[254]  JSD argues Nielson has failed to create an inference of discrimination because Wilson testified that she specifically did not consider her notes related to Nielson's mental and physical disabilities in evaluating Nielson's RIS rubric.[255]

The court finds that Nielson has met the "relatively lax" burden of establishing her prima facie case under the Rehabilitation Act.[256]  To meet her burden at the prima facie stage, Nielson need only demonstrate the "small amount of proof necessary" for a reasonable jury to infer discrimination "by a preponderance of the evidence."[257]  At summary judgment, the court will "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party," which on this claim is Nielson.[258]  But the court will not weigh the evidence or make credibility determinations.[259]  The evidence viewed in Nielson's favor shows that: (1) Wilson made contemporaneous notes on the RIS rubric while scoring Nielson; (2) the handwritten notes referenced Nielson's FMLA leave, her mood changes, and her recent health emergencies; (3) Wilson generally considered her handwritten notes when scoring Foothills' teachers; and (4) Nielson's rubric score resulted in her being subjected to a RIS.  The parties

---

[253] Dkt. 39 at 56–57.

[254] *Id.*

[255] Dkt. 32 at 29; Dkt. 44 at 21.

[256] *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004); *see also Burdine*, 450 U.S. at 253 ("The burden of establishing a prima facie case [in the *McDonnell Douglas* framework] is not onerous.").

[257] *Smothers*, 740 F.3d at 539.

[258] *N. Nat. Gas Co.*, 526 F.3d at 629.

[259] *See Liberty Lobby*, 477 U.S. at 249.

genuinely dispute the extent Wilson considered her handwritten notes in scoring Nielson's RIS rubric[260] and whether Nielson's mood swings were attributable to her depression and cancer diagnosis.[261]  Based on the record at summary judgment, the court concludes a reasonable jury could infer a causal connection between Nielson's disabilities and her RIS.

### c.  Legitimate Reason for Termination

Nielson having established her prima facie case, the burden shifts to JSD to "articulate some legitimate, nondiscriminatory reason" for her RIS.[262]  JSD's "burden at this stage is one of production, not one of persuasion."[263]

JSD asserts Wilson had to perform a RIS because of Foothill's declining enrollment and, as the teacher with the lowest rubric score, Nielson was RISed.  JSD asserts Nielson scored poorly on the RIS rubric, not because of her FMLA leave or her disabilities, but because: (1) Nielson did not record her sick time in the Skyward timekeeping system; (2) Nielson was unprofessional towards other teachers, Wilson, and JSD personnel; (3) Nielson's classroom was chaotic; and (4) Nielson did not prepare substitute teacher plans for general emergencies or for her January FMLA leave.[264]  JSD has articulated legitimate reasons for Nielson's RIS, unrelated to her FMLA leave or her disabilities.

### d.  Pretext

With the first two *McDonnell Douglas* steps satisfied, the burden returns to Nielson to "show that there is a genuine dispute of material fact as to whether [JSD's] reasons for [RISing]

---

[260] *See* Dkt. 32 at 10; Dkt. 39 at 18, 24–25.

[261] *See* Dkt. 39 at 15; Dkt. 44 at 10–11.

[262] *McDonnell Douglas Corp.*, 411 U.S. at 802.

[263] *Smothers*, 740 F.3d at 539 (quoting *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1191).

[264] Dkt. 32 at 29–30.

her are pretextual."[265]  Notably, JSD's motivation for deciding to RIS Nielson "is itself a factual question."[266]  Nielson may meet her burden "by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [JSD's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[267]  The evidence Nielson may present to establish pretext "may take a variety of forms[;]" she "may not be forced to pursue any particular means of demonstrating that [JSD's] stated reasons are pretextual."[268]  One way Nielson may show pretext is by establishing that JSD's asserted reasons for her RIS are false.[269]  Nielson's "prima facie case, combined with sufficient evidence to find that [JSD's] asserted justification[s] [are] false, may permit the trier of fact to conclude that [JSD] unlawfully discriminated" against Nielson when selecting her for the RIS.[270]

Nielson argues that JSD's asserted reasons for her RIS are "unworthy of credence" because they rely entirely on Wilson's own testimony, which is "inconsistent with the District's own records."[271]  Nielson disputes each of JSD's asserted reasons for her low score on the RIS rubric and contends: (1) she did record her sick time in Skyward, as reflected by the system's accounting aligning with Wilson's recollection of Nielson's time off; (2) she maintained positive

---

[265] *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1290 (10th Cir. 2007) (quoting *Metzler*, 464 F.3d at 1172).

[266] *Smothers*, 740 F.3d at 538 ("When evaluating an employer's motives or reasons, motivation is itself a factual question.") (internal citation and quotation marks omitted).

[267] *Id.*; *see also Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) ("[The] critical question regarding this aspect of the *McDonnell Douglas* rubric is whether a reasonable factfinder could [] find the employer's rationale unworthy of credence and hence infer that the employer did not act for the asserted non-retaliatory reasons.") (internal quotation marks and citation omitted).

[268] *Kendrick*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[269] *See id.*; *see also Cole v. Ruidoso Mun. Schs.*, 45 F.3d 1373, 1380–81 (10th Cir. 1994) (finding plaintiff may survive summary judgment by presenting evidence that defendant's asserted reason for the adverse employer action was false).

[270] *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 117, 1135 (10th Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

[271] Dkt. 39 at 58.

relationships with coworkers and an engaged, well-managed classroom, as reflected by her most recent JPAS; and (3) she did prepare substitute teacher plans for both her general absences and FMLA leave, as reflected by her most recent JPAS and by Nielson's own attestations.[272]

The parties genuinely dispute whether Wilson considered her handwritten notes when scoring Nielson's RIS rubric, whether Nielson entered her days absent in the Skyward system, and whether Nielson provided effective substitute teaching plans prior to her absences.[273]  And, while not mutually exclusive, the record contains evidence showing both that Nielson had a history of positive professional relationships, "engaging students in learning[,] [and] . . . managing student behavior,"[274] and that Wilson perceived Nielson to have struggled with her professional relationships in the year leading up to her RIS and observed her classroom to be chaotic with no direct instruction.[275]  This record is thus "sufficient to raise a fact issue as to whether [JSD's] reasons for [RISing Nielson] were pretextual and, significantly, does not contain the requisite 'abundant and uncontroverted independent evidence that no discrimination had occurred.'"[276]  On this record, a reasonable jury could find JSD's asserted reasons for Nielson's RIS unworthy of credence.

---

[272] *Id.*

[273] *See* Dkt. 32 at 10; Dkt. 39 at 23–25.

JSD further argues the parties only dispute whether Nielson entered her sick days into the Skyward timekeeping system and it is undisputed that Wilson *believed* Nielson failed to ender her sick days.  Dkt. 44 at 23.  JSD argues the court must "look at the facts as they appear to the person making the decision to terminate the plaintiff[:]" Wilson.  S*ee* Dkt. 44 at 22–23 (citing *Kendrick*, 220 F.3d at 1231).  However, in *Kendrick*, "the undisputed evidence show[ed] that [the employer] decided to terminate Kendrick based on his belief that Kendrick pushed Tirrell and then verbally abused him.  There was no evidence before [the employer] to suggest that Kendrick had not, in fact, made physical contact with Tirrell." 220 F.3d at 1231.  Here, the parties dispute whether Nielson properly recorded her time, citing different evidence in the record.  Dkt. 32 at 30; Dkt. 39 at 58.  Because properly recording absent days is a fact external to the parties' internal beliefs and the record supports both parties' positions, the court finds the parties genuinely dispute facts material to JSD's asserted reason for terminating Nielson.

[274] *See* Dkt. 39 at 58.

[275] *See* Dkt. 32 at 30.

[276] *Doebele*, 342 F.3d at 1139 (quoting *Reeves*, 530 U.S. at 148).

At summary judgment, the court must view the record in the light most favorable to the non-movant—on this claim, Nielson—and draw reasonable inferences from the evidence in her favor.[277]  In other words, "all doubts concerning pretext must be resolved in [Nielson's] favor."[278]  The Tenth Circuit has instructed that summary judgment should be denied when "there is clearly conflicting evidence in [the] record showing that genuine questions of fact remain on the material issue[] [of] whether [JSD's] proffered reason for its action against [Nielson] was pretextual."[279]  Nielson has established that genuine disputes of material facts remain as to whether JSD's alleged reasons for RISing her are pretextual.

In sum, the question of JSD's motivation or reason for selecting Nielson to be RISed turns on issues of disputed material fact that are properly left to the jury.  Because Nielson has met her prima facie burden as to both her FMLA and Rehabilitation Act claims and has demonstrated a genuine fact issue as to pretext, the court DENIES JSD's Motion for Summary Judgment as to Nielson's FMLA retaliation and Rehabilitation Act discrimination claims.

## CONCLUSION

For the reasons stated, Plaintiffs' Motion for Partial Summary Judgment[280] is DENIED as MOOT and Jordan School District's Motion for Summary Judgment[281] is DENIED in part and DENIED as MOOT in part.  The court GRANTS summary judgment for Plaintiffs on their declaratory judgment claim and GRANTS partial summary judgment for Plaintiffs on their due process claims.

---

[277] *See, e.g.*, *Campbell*, 478 F.3d at 1287; *Doebele*, 342 F.3d at 1137.

[278] *Doebele*, 342 F.3d at 1139 (citation omitted).

[279] *Cole*, 43 F.3d at 1380.

[280] Dkt. 23.

[281] Dkt. 32.

SO ORDERED this 17th day of August 2022.

BY THE COURT:

_____

ROBERT J. SHELBY

United States Chief District Judge